[Civ. No. 28211.   Second Dist., Div. Four.   Dec. 28, 1965.]

HARRY ERNEST RUBENS, Plaintiff and Appellant, v. TEXAM OIL CORPORATION, Defendant and Respondent.

Guilford & Kleinman and Samuel DeGroot for Plaintiff and Appellant.

Greenberg, Shafton & Bernhard, Maxwell E. Greenberg, Herbert A. Bernhard and Loren R. Rothschild for Defendant and Respondent.

FILES, P. J.—Plaintiff paid $15,000 for a 1 percent interest in an oil lease, and agreed, in addition, to pay his pro rata share of drilling costs. He actually paid $1,228.16 towards expenses, and owed an additional $426.49 when the venture was abandoned because of failure to find oil in paying quantities. Plaintiff then brought an action to recover his money from Texam Oil Corporation, which was both the transferor of the 1 percent interest and (during a portion of the time) the operator of the drilling venture. Texam counterclaimed to recover the $426.49 due under the contract. The trial court gave judgment that plaintiff take nothing on his complaint and that defendant recover the amount of its counterclaim. Plaintiff is appealing from the judgment.

Although plaintiff asserts in his brief that "There are many independent grounds for requiring the return" of his investment, all of his arguments center around the theory that there were violations of the Corporate Securities Act which made the transaction "void" and thereby entitled him to rescind. (Corp. Code, § 26100.) Some background facts which are not in dispute may be stated first to place the issues in context.

Plaintiff is a patent attorney who has practiced in New York City since 1930. Mr. A. L. Koolish is plaintiff's second cousin. In 1957 plaintiff told Koolish he had money to invest and asked Koolish to let him know if he had a deal.

On August 4, 1958, Guiberson & Burke applied to the California Commissioner of Corporations for a permit to issue to certain named persons undivided working interests in the oil lease which is involved in this action. Koolish was one of the proposed transferees. Another of the transferees named in the application was Angelus Oil Co., Inc., as to a 5 percent interest. Exhibits attached to the application indicate that defendant Texam Oil Corporation was intended to have an $8\frac{1}{4}$ percent interest, but through oversight Texam was not included in the list of proposed transferees. On August 18, 1958, the commissioner issued a permit consenting to the issuance of the "securities," i.e., the working interests, to the persons named in the application. The permit was subject to the customary conditions to restrict transferability: The permit provided that the securities, when issued, must be delivered to an escrow holder to be held in escrow pending further order of the commissioner; and that the owner "shall not consummate a sale, assignment, or transfer of said securities or any interest therein, or receive any consideration therefor, until the written consent or permit of said Commissioner shall have been obtained so to do."

Mr. Earl Hightower was designated as escrow holder for this purpose.

Prior to August 18, 1958, Angelus Oil Co., Inc. was merged into Texam.

Texam desired to sell some of its interest in the venture, and for this purpose opened an escrow (which will be referred to as the commercial escrow) with Mr. Hightower as escrow holder. Koolish informed plaintiff of this investment opportunity. Under date of September 11, 1958, plaintiff signed escrow instructions whereby he agreed to purchase from Texam, subject to the approval of the Commissioner of

Corporations, a 1 percent interest for a price of $15,000. To pay for this, plaintiff drew two checks in the amount of $7,500 each, dated August 10, 1958, and payable to "Tex-Am Corporation," and delivered them to Koolish, who held them until plaintiff had signed the escrow instructions. Then Koolish mailed the checks and the signed instructions to Hightower. Under the terms of this commercial escrow the purchase price was to be paid by plaintiff to Mr. Hightower as escrow holder; and the escrow was not to be completed and the consideration was not to be delivered to Texam until after the commissioner had consented to the transfer. In order to make it possible for Mr. Hightower to cash plaintiff's checks, an officer of Texam came to Hightower's office and endorsed each of them. Following this Hightower deposited the checks in his trust account.

On November 3, 1958, Guiberson & Burke applied to the Commissioner of Corporations for a permit to issue an undivided 8¼ percent working interest to Texam. On the same day Texam applied for permission to transfer interests totaling 4-3/16 percent to the persons who had joined in the commercial escrow, including plaintiff. On November 5, 1958, the commissioner issued a permit and a consent to transfer as requested in the applications. Thereafter the securities were issued and transferred.

■ We must reject plaintiff's contention that Texam violated the law by receiving the consideration from plaintiff prior to obtaining the commissioner's consent to transfer. The trial court found the facts against plaintiff on this issue, and the findings are supported by substantial evidence. It is not the function of this reviewing court to reweigh the evidence. (*Bancroft-Whitney Co.* v. *McHugh,* 166 Cal. 140, 142 [134 P. 1157].)

Texam was not the issuer of the security which plaintiff was purchasing, for Texam was simply offering to transfer (subject to the commissioner's approval) a security which had been lawfully issued by Guiberson & Burke under the August 18 permit. The terms of that permit prohibited the consummation of a sale and the acceptance of consideration; but the permit did not prohibit the making of an executory agreement to sell, subject to the commissioner's approval. (*Kaneko* v. *Okuda,* 195 Cal.App.2d 217, 232 [15 Cal.Rptr. 792].) Under the terms of the written agreement which plaintiff entered into on September 11, 1958, neither a transfer of

the security nor receipt of consideration could take place until the commissioner gave his consent.

Plaintiff's written agreement required him to deposit $15,000 in escrow with Mr. Hightower. It was plaintiff's mistake that he made the checks payable to "TEX-AM CORPORATION." The act of Texam's officer in endorsing the checks over to Hightower was the simplest way of correcting plaintiff's error. The evidence supports the trial court's finding that Texam did not receive the funds before the commissioner gave his consent to the transfer.

▇ The evidence also supports the trial court's finding that Koolish was not Texam's agent at any time. ▇ Agency is ordinarily an issue of fact, and in resolving it the trial court may draw inferences from the conduct of the parties as shown by the evidence. (*Thayer* v. *Pacific Elec. Ry. Co.*, 55 Cal.2d 430, 438 [11 Cal.Rptr. 560, 360 P.2d 56].) ▇ Plaintiff points to the fact that Texam's reason for selling interests to plaintiff and others was that Texam needed the money to pay for some Texas oil property which it was purchasing from Koolish. Granting that Koolish and Texam had a common motive in finding investors who would purchase from Texam, it does not necessarily follow that Koolish was acting on behalf of or under the control of Texam. The evidence shows that plaintiff wrote his checks and mailed them to Koolish long before he ever saw or signed the escrow instructions which stated the terms of the transaction. This simply reflects plaintiff's haste to invest upon the recommendation of Koolish, whose advice plaintiff had solicited earlier. Under the findings of the trial court plaintiff's checks were held by Koolish as plaintiff's agent until they were properly deposited in the escrow.

*Ogier* v. *Pacific Oil & Gas Dev. Corp.*, 135 Cal.App.2d 776 [288 P.2d 101], relied upon by plaintiff, is based upon a different state of facts, although there is a superficial similarity. In *Ogier* the defendant agreed to sell to plaintiff an oil royalty (i.e., a security) without having first obtained a permit from the Commissioner of Corporations. At the time the agreement was made plaintiff delivered to defendant's agent two checks, payable to defendant for the full amount of the price. The checks were cashed after a permit had been issued. The court there held that the delivery of the checks to defendant's agent constituted illegal receipt of the consideration on the date the checks were delivered. In the case at bench the parties (who were dealing with a security issued

by another entity) agreed in writing that payment would be made through escrow. Plaintiff's checks were never in the possession of Texam. When the checks were cashed by the escrow holder, the proceeds were held in trust for plaintiff until the sale could be consummated in accordance with the written agreement of the parties.

■ Plaintiff also seeks to make capital out of a harmless error made by Mr. Hightower as holder of the commercial escrow. It appears that Texam had instructed Hightower that when the escrow closed, defendant's share of the proceeds was to be disbursed to R. E. Stolkin. On October 30, 1958, Hightower drew a check on his trust account in the amount of $37,500 and mailed it to Stolkin's office in Chicago. Mr. Hightower testified that when he discovered that the check had been mailed out prematurely, he gave instructions to someone in his office to call Stolkin's office and ask that the check be held. The check did not clear Hightower's bank account until November 7, which was after the commissioner had issued his consent to transfer the security.

Hightower was holding $15,000 in trust for plaintiff until the commissioner's consent to transfer could be obtained, and any premature disbursement by Hightower would have constituted a breach of trust. Such a breach, if it had occurred, would not have been imputable to Texam, which had no control over Hightower or any right to control him.

■ Another irregularity, which was inconsequential, occurred on October 20, 1958, when Texam billed the members of the venture for their pro rata shares of the drilling expense. At that time a bill for $687.50, representing a 1 percent interest, was sent to plaintiff. As of that date plaintiff had not yet become an owner of any interest and had not yet become liable for any part of the expenses. No harm was done. Plaintiff did not remit until after the commercial escrow had closed. The inadvertent listing of plaintiff among the owners and the mailing of the bill on October 20 do not compel a finding that an illegal sale of a security had been consummated as of that date.

■ Finally, plaintiff's brief on appeal suggests that the Angelus Oil Co., Inc. merger was not effective to entitle Texam to offer the security which had been issued in the name of Angelus under the application of August 4, 1958. This is the exact opposite of the position which plaintiff took in the trial court. The complaint alleges and the answer

admits that "subsequent to August 18, 1958, and before September 5, 1958, the defendant, TEXAM OIL CORPORATION, became the owner of the fractional interest of the Angelus Oil Co., Inc." The identical statement appears in the joint pretrial statement as one of the "admitted facts." The plaintiff's contentions, as listed in the pretrial statement, are to the effect that defendant accepted the $15,000 before it reached the commissioner's consent to transfer. Nowhere in the pretrial statement is there any contention that Texam did not have a fractional interest at the time it contracted with plaintiff. The case was tried upon the assumption that Texam stood in the shoes of Angelus for all purposes, and there was no occasion to introduce evidence or examine the law which might have applied had an issue been raised. It is too late to raise the issue now.

The judgment is affirmed.

Jefferson, J., and Kingsley, J., concurred.